_____

|                        |     |                        |
|                        | )   |                        |
| **BETH E. SHEA,**      | )   |                        |
|                        | )   |                        |
| **Plaintiff,**         | )   | **Civil Action No.**   |
|                        | )   | **08-12148-FDS**       |
| **v.**                 | )   |                        |
|                        | )   |                        |
| **R. BRADFORD PORTER,**| )   |                        |
|                        | )   |                        |
| **Defendant.**         | )   |                        |
|_____| )   |                        |

**MEMORANDUM AND ORDER**
**ON MOTION FOR RECONSIDERATION**

**SAYLOR, J.**

This is a civil rights action arising out of an arrest by an officer of the Massachusetts

State Police. On June 5, 2007, plaintiff Beth Shea was driving on a residential street in Milton

when a woman stepped into the street and waved her arms at her. Shea thought that the woman,

Tracy Gorfinkle, was in trouble; Gorfinkle thought Shea was driving too fast and wanted her to

slow down. Shea stopped her car. A state trooper named R. Bradford Porter, who was a friend

and neighbor of Gorfinkle's, was on the sidewalk. He was wearing plain clothes, although his

badge was on his belt and his gun was in a holster on his hip. Porter walked up to the car,

banged on the window, and asked her to roll it down. Shea, not realizing that he was a police

officer, did not comply. After less than a minute, Porter left Shea alone and walked away. Shea

then drove away.

Porter got in an unmarked cruiser and chased after Shea, catching up with her about a

half-mile away. He was red-faced and enraged. After pounding on the window until his hand

was bleeding, he retrieved a flashlight from his car and shattered the window. He then opened the door and dragged her out, shouting obscenities at her and calling her a "fucking bitch." Neither Shea nor any of the four witnesses to the episode who testified at the trial realized that Porter was a police officer. Multiple witnesses to the event called 911, thinking that Shea was a victim of domestic violence. Milton police officers quickly arrived on the scene, and Shea was taken away in handcuffs.

Shea was later charged with assault with a dangerous weapon, resisting arrest, speeding, reckless operation of a motor vehicle, failure to identify herself, and failure to stop for police. Several months later, in October 2007, the criminal case against Shea was nolle prossed, and her record was expunged.

Shea brought suit under 42 U.S.C. § 1983, alleging that her arrest and the ensuing events violated her constitutional rights under various theories. She also brought a series of state law claims. The case was tried to a jury in 2013. The jury found for plaintiff on her claim of malicious prosecution and awarded her $60,000 in damages. It found for defendant Porter on her claims under 42 U.S.C. § 1983 for unlawful arrest and excessive force.

Plaintiff moved for judgment notwithstanding the verdict and a new trial, which the Court denied without written opinion. Plaintiff has now moved for reconsideration of the denial of the motion for a new trial, contending that the Court did not correctly apply the legal standard to the facts.

For the reasons set forth below, and after careful consideration, the motion for reconsideration will be granted. The jury's verdict—specifically, its verdict as to the claims of false arrest and excessive force—were against the clear weight of the evidence and will be set

aside in favor of a new trial.

I.    **Background**

   A.    **Events on Centre Lane**

   Beth Shea is a lifelong resident of Milton, Massachusetts. (Tr. 4:142). At the time of the events at issue, she was approximately 44 years old. (*See* Tr. 4:142).

   On June 5, 2007, at approximately 5:00 p.m., Shea was driving through Milton on her way home from work. (Tr. 4:143; 5:74). She was driving a Jeep Grand Cherokee, a sport utility vehicle. (Tr. 2:164). She was alone in the vehicle. To avoid traffic, she turned onto Centre Lane. (*See* Tr. 5:74).

   As she drove down Centre Lane, Shea noticed a car parked on the right-hand side of the street, facing the wrong direction. (Tr. 4:144; 5:75-76). She then saw a woman "dashing" out in front of the car, waving her arms. (Tr. 4:144; 5:76).

   The woman was Tracy Gorfinkle. (Tr. 5:76). Shea did not know her, and had not seen her before. (*See* Tr. 6:96). Gorfinkle lived on Centre Lane. (Tr. 6:89).

   It is undisputed that Gorfinkle ran a short distance into the street, and that she was trying to get Shea's attention. (*See* Tr. 5:79; 6:94). Gorfinkle testified that she thought Shea was speeding, and her hand motions were intended to get her to slow down. (Tr. 6:94). Shea, however, thought Gorfinkle needed help. (Tr. 5:79).

   Shea pulled over and brought her car to a quick stop. (Tr. 5:79-80). It stopped a short distance away from Gorfinkle. (*See* Tr. 4:120).

   Bradford Porter was a Massachusetts State Police officer who lived next door to Gorfinkle. (Tr. 3:62, 67, 167, 170; 6:90). He and Gorfinkle were friends. (*See* Tr. 3:70-73).

Gorfinkle also provided daycare for his child.  (Tr. 3:70, 169; 6:90-92).  At the time of the incident, Porter had been a state trooper for less than two years.  (Tr. 3:167-68).

Porter was off-duty at the time of the incident.  (*See* Tr. 3:176-78).  He had just arrived home and was standing on the sidewalk talking to Gorfinkle.  (Tr. 3:176-78; 6:92).[1]  When Shea drove down Centre Lane, Porter had his back to the oncoming car.  (Tr. 3:180).  He heard Gorfinkle say, "oh my God."  (Tr. 3:180, 3:68).  Gorfinkle then crossed the grass strip between the sidewalk and the street and stepped out into the street.  (Tr. 3:180-81, 3:68-69).

Porter was wearing street clothing, consisting of an open-collar polo shirt and blue pants.  (Tr. 3:109, 6:18).  He was wearing a badge on his belt and a gun in a holster on his right hip.  (Tr. 3:80-81, 119, 172).

###     1.     The Vehicle "Swerve"

Shea testified that she stopped the car when Gorfinkle ran into the street.  (Tr. 5:80).  Because of the parked car, she did not park parallel to the edge of the street, but on an angle.  (Tr. 4:144-45; 5:78).[2]  She first came to a stop, then turned in toward the side of the road and stopped again.  (Tr. 5:78).  Her brakes did not squeal, and there was no evidence that her tires either skidded or squealed.  (*See* Tr. 3:75-77).[3]  She denied that she swerved her car at Gorfinkle.  (Tr. 5:77-81).

Porter testified that Shea drove her vehicle at a "high rate of speed, stopped very quickly,

---

[1] Porter's son and Gorfinkle's daughter were also outside, apparently in the yard.  (Tr. 3:178).

[2] Porter denied that there was a car parked on that side of the street.  (Tr. 3:180-81)

[3] There was no evidence that the front end of the vehicle dipped as Shea applied the brakes, as would be expected if the vehicle were traveling at a high rate of speed and came to a sudden stop.

and veered right at [Gorfinkle]." (Tr. 3:181).[4] He testified that Shea's car came to a stop "within arm's length" of Gorfinkle. (Tr. 3:181).

Gorfinkle testified that the car "swerved at me, literally at me, almost hit me." (Tr. 6:94). Gorfinkle testified that Shea "looked [her] in the eye" when she stopped. (Tr. 6:95).[5]

There was no testimony that Shea said or shouted anything to Gorfinkle, or that she made any gesture (such as an extended middle finger) to suggest anger or malice. According to Porter, Shea "did not look at [Gorfinkle]" or "attempt to speak to her in any way." (Tr. 3:183).

Gorfinkle did not say anything aloud in response to the stopping of the car. (*See* Tr. 3:85, 125; 6:95). She also did not cry out in fear or alarm. (*See* Tr. 3:125-26; 6:95). There was no testimony that she jumped back or took any other kind of defensive or protective action. There was no evidence that she flinched or made a startled movement.

At some point soon afterward, Gorfinkle went into her house, without having said a word to Porter about the incident. (Tr. 3:83-84, 158).[6]

### 2. Shea's Version of the Centre Lane Events

Shea testified as to the next sequence of events as follows.

Immediately after she came to a stop, Shea put the car in park, picked up her cell phone,

---

[4] It is unclear whether Shea was speeding or not. Shea testified that she "[didn't] think she was speeding." (Tr. 5:75). There was no testimony that any speed limit was posted, and therefore the speed limit appears to have been 30 miles per hour. (*See* Tr. 6:99-100; *see also* Mass. Gen. Laws ch. 90, § 17 (exceeding 30 miles per hour for one-eighth of a mile in a "thickly settled" area is *prima facie* evidence of unreasonable speed). Gorfinkle testified that "it's a small street, there are children everywhere, so 30 is obviously — but the car seemed to be going faster than that anyway, but, yes, 30 is fast when there's children everywhere." (Tr. 6:100).

[5] Gorfinkle testified that Porter then "took over the situation." (Tr. 6:95). She also testified that she found the experience "terrifying." (Tr. 6:96).

[6] Porter did not ask Gorfinkle if she had felt threatened, or indeed any questions at all. (Tr. 3:158).

and called 411 in order to be connected to the Milton Police. (Tr. 4:145-46; 5:79-80).[7] She did so because she thought Gorfinkle needed help. (Tr. 4:144-46; 5:79).[8] While she was on the phone, she saw or heard Gorfinkle say, "slow down." (Tr. 4:146). She then testified as follows:

> . . . I thought oh, my God, that's what she wanted, so I kind of went back in my seat, and then all of sudden I was really scared because there was a bang at my window, and I heard, "Police officer, you're going to jail for the night."

(Tr. 4:146).

Porter had approached the car on the driver's side, and was standing next to the window. (Tr. 5:82-83). As noted, he was in street clothes. He identified himself as a police officer. (Tr. 5:83-84). He did not ask Shea for her driver's license and registration. Although he testified that he pointed to the badge on his belt, Shea testified that she did not see it. (Tr. 5:86). Porter did not show her any photographic identification or credentials. (Tr. 3:120, 139).

Porter knocked on the window and told her to roll it down. (Tr. 5:85-86). Shea testified that she was somewhat confused, and did not understand Porter to be a police officer, because he was not in uniform and she did not "believe police would ever speak like that." (Tr. 5:86-87). She was afraid to open her window or door. (Tr. 5:88).

> . . . Then I thought this is the guy that she needs the help for, and I didn't know. I had no idea what's going on. I had no idea what's going on, so he was hitting my window telling me to roll down the window, and I told him I was on the phone with the police. . . .
>
> . . . He heard me because he said ["]I am the police.["]
>
> I got in touch with the [Milton police] officer, and I was telling her exactly what happened, and I said, "I don't know what's going on because the woman came out in the street, I stopped, now there's this guy hitting my window." He was extremely

[7] Shea's cell phone records corroborate that she made the call. (Tr. 4:145).

[8] Shea never actually spoke to Gorfinkle. (Tr. 5:81-82).

mad, his face was all red, and I had no idea. I said, "Could you please send somebody down." . . . [S]he asked me the name of the road, and I didn't know the name of the road, and I tried to describe it. . . .

He was still yelling at me, and he was hitting my window, and I told him to stop hitting my window, I'm on the phone with the police. He kept doing it, then he tried to open my door . . . .

(Tr. 4:146-47).

At that point, Porter left Shea, turned his back to her, and went inside his house. (Tr. 3:64; *see* Tr. 2:68-69).[9] Porter did not tell Shea to stay where she was, or provide any explanation as to where he was going or why. (Tr. 4:29). Shea described what happened next as follows:

. . . then as I was talking [to the Milton police officer], I was trying to keep my eye on him, he went around the back of my car, and I noticed he looked down at my license plate, then he came over to the other side, and then the next thing I know, he goes away in his house.

(Tr. 4:147).

Shea had "no idea" why Porter went into the house. (Tr. 5:88). Gorfinkle had also gone into her own house. (Tr. 3:83-84; 5:90). Shea was left alone. (Tr. 4:148). She then drove away. (Tr. 5:88, 121).

The entire episode on Centre Lane happened very quickly; Porter testified that he was at the side of Shea's vehicle for approximately 45 seconds. (Tr. 4:35).

### 3. Porter's Version of the Centre Lane Events

Porter's version of the events on Centre Lane was as follows.

After Shea's car came to a stop, he approached the driver's side window of the car. (Tr.

_____

[9] Shea did not know Porter, and therefore could not have known that he lived in the house.

3:75).[10]  He testified that he identified himself as "state police."  (Tr. 3:76, 182-83).  He told

Shea to roll down the window.  (Tr. 3:76, 182-83).  She did not comply.  (Tr. 3:80, 183).  He

testified that "[t]he driver didn't look at me, didn't acknowledge that I was there, didn't make

any type of movement or anything to make me feel like she knew I was there."  (Tr. 3:183).  He

made multiple requests, but she would not roll down the window.  (Tr. 3:78-81, 183).  He

testified that he pointed to his badge.  (Tr. 3:80).  He also knocked on the window.  (Tr. 3:80,

184).  When he knocked, she told him not to touch her car.  (Tr. 3:81, 184; 4:30).  At some point,

he tried to open the driver's side door.  (Tr. 3:184-85).

Porter did not testify that he asked for her driver's license and registration.  Although he

had photographic identification with him, he admitted that he did not take it out and show it to

her.  (Tr. 3:120, 139).

Porter testified that he then "jogged" away from the car and into his house.  (Tr. 3:184).

He testified that his purpose in doing so was to retrieve his car keys, because he "decided that

[he] might need his cruiser."  (Tr. 3:184).[11]  It is undisputed that he did not explain to Shea where

he was going.

Porter admitted that he did not tell Shea to stop or remain where she was.  (Tr. 4:29).  He

simply assumed that "it was understood that she had been approached, if you will, by a police

officer."  (Tr. 4:29).  He also testified, however, that she was "free to leave."  (Tr. 4:29).  He did

not tell her that she was under arrest.

---

[10] Porter testified that what he had seen was "consistent with an assault" and that he wanted to keep an "open mind" and "investigate further."  (Tr. 4:32-33).  He also testified that "[a]t that point it wasn't abundantly clear to me what had happened" and that he wanted to "investigate."  (Tr. 3:181-82).  He testified that he wondered if the driver had a "medical issue" or if there was a "mechanical issue with the vehicle."  (Tr. 3:182).

[11] Porter did not explain why he felt he might need his cruiser.

Gorfinkle's husband, Brian Murphy, who witnessed part of the episode, testified that Shea pulled away "slowly" when she left the scene and "drove slowly down the street." (Tr. 2:70). However, Porter testified that Shea drove away from the scene at a "high rate of speed." (Tr. 3:132).

### B.    The Events on Clifton Road

Shea made it to an intersection about a half-mile away on Clifton Road in Milton. (Tr. 4:17; 5:93; *see* Tr. 2:150). There, she stopped directly behind another vehicle at a stop sign. (Tr. 4:149).[12] At that point, she heard a siren and saw blue lights behind her in her rear view mirror. (Tr. 4:149; 5:93-94; *see* Tr. 3:101).

Porter had pursued Shea in an unmarked vehicle. (Tr. 3:109).[13] It was equipped with a siren and blue police lights mounted in the grille. (Tr. 3:109, 5:93).

Porter had a radio in his vehicle. (Tr. 4:16). He did not radio for a marked cruiser, or any kind of backup, at any time. (Tr. 4:16-17).[14] He testified at one point that he did not do so because he "didn't know what she might do next." (Tr. 3:121). He testified at another point that he did not have an "opportunity to turn on the radio." (Tr. 4:16-17).

Porter did not record Shea's license plate, or run it through the computer, at any point. (Tr. 3:61). He testified that he did not do so because he "forgot." (Tr. 3:61).

Porter pulled his vehicle directly behind Shea's. (Tr. 2:167). He got out of his car and

---

[12] The driver of that car was later identified as Maureen Flanagan, who testified as a witness.

[13] The vehicle was a Dodge Intrepid. (Tr. 3:108). It did not have a "cage" separating the rear of the cruiser from the front in order to permit the transport of prisoners. (Tr. 3:175).

[14] Both the Milton police station and the Milton state police barracks were a short distance away. (Tr. 6:22).

came to the driver's side window of Shea's car.  (Tr. 5:94-96).  Shea realized it was the same man

who had approached her car on Centre Lane.  (Tr. 5:94-96).

1.      **Shea's Version of the Clifton Road Events**

Shea described what happened next as follows:

> He was extremely mad.  He was hitting my window, my driver's window with his fist.
> He started calling me "a fuck'n bitch" over and over, "get out of the fuck'n car," and
> I looked at him, and I said, "I'm calling the police," and I grabbed my cell phone, and
> he kept punching my window, and he punched it so hard that it kind of spidered, it
> didn't create a hole, but it spidered, and I could see blood on the window, and then he
> left my car and went back to his car.

> . . . I was looking forward, and I was talking on the phone, I think it was the police,
> and I was sitting in the driver's seat, and the next thing I knew out of the corner of my
> eye was him taking that flashlight and taking a huge swing at my window over and
> over violently.  He was so mad.

> . . . I told him to stop, I was on the phone with the police, and then the next thing I did
> was try and move my body over towards the passenger's side because I was getting
> glass all over my face, and I was afraid the flashlight was going to hit me, it was right
> next to my head.

> . . . Then he got the door opened, and he was swearing at me again, and I had the
> phone in my hand, and I kind of grabbed it, and the next thing I knew, he grabbed my
> wrist, he violently pulled me out so hard that I fell on the ground.

(Tr. 4:150-51; *see* Tr. 5:96-100).[15]  Porter never told her that she was under arrest.  (Tr. 5:99).

She "begged" bystanders for help and to call the police.  (Tr. 4:152).

She then testified as follows:

> I didn't want to agitate him anymore.  He was — he was in between the car — the
> car door was open now, so he was in front of it.  I got myself up, and he said,
> "You're fuck'n mine," and he — his hands were all over the front of me, and I felt
> violated, and I said, "What are you doing?"  He said, "You're fuck'n mine," and
> then he took his hands again and started handling me like down below, and I said
> to myself, "I'm not going to stand here and let him do this," and I went to the left,

---

[15] Shea also testified, "I was not going to get out of that car [voluntarily] with how enraged he was."  (Tr. 5:97).

10

and I told myself don't run because that's going to agitate him, just walk forward, so I walked towards [the car in front of mine].

(Tr. 4:152). Shea testified that during the episode, Porter touched her breasts and put his hand "below her waist." (Tr. 5:100-01). She got up from the ground and momentarily walked away, but Porter then came up from behind and grabbed her arm and handcuffed her. (Tr. 4:153; 5:100-02).

A number of Milton police officers soon arrived on the scene in response to multiple 911 calls. (Tr. 6:38). One of the Milton police officers, John King, was in plainclothes. (Tr. 6:18). When he arrived, Shea asked him in an agitated voice to call the Milton police. (Tr. 6:20-21, 25). King showed her photographic identification in order to try to convince her that he was a police officer. (Tr. 6:21, 26). Shea was begging the officers, "Help me, he's going to kill me." (Tr. 4:153).

Another of the Milton police officers was a woman named Jennifer Daukas. (Tr. 6:22). Shea sought Daukas's protection as soon as she arrived on the scene. Shea testified:

I was standing with the woman police officer, and Mr. Porter kept screaming, "She's fuck'n mine, you're not taking her." They were circling him and trying to calm him down, and I said to Jennifer, "Please don't let him take me."

(Tr. 4:158). Shea quickly calmed down in the presence of officer Daukas. (Tr. 6:35-36).

Daukas put on a pair of gloves in order to pick the broken glass off Shea's face and out of her hair. (Tr. 4:153-54). Blood from Porter's cut was on Shea's blouse and pants. (Tr. 4:155-57; Exs. 44, 45).[16]

King suggested to Porter that the Milton police transport Shea from the scene. (Tr. 6:22,

---

[16] King described the blood on Shea as "splatter." (Tr. 6:21, 32-34). The blood was also on Porter's clothes. (Tr. 6:19).

45).  Shea was then transported in a Milton police cruiser by a male officer and Daukas to the state police barracks in Milton.  (Tr. 6:22-23).

### 2.     Eyewitness Testimony from the Clifton Road Events

Multiple neighbors and motorists in the vicinity witnessed the episode on Clifton Road.

### a.     Kevin Burke

A passing motorist, Kevin Burke, testified that Porter was flailing his arms and punching the car.  (Tr. 2:26).  Burke testified that Porter was shouting, in a "very belligerent" voice, "get the fuck out, get the fuck out."  (Tr. 2:26.).  Burke "had no idea" that Porter was a police officer. (Tr. 2:27).  Burke also testified that Shea was "screaming h[yste]rically," and that she was saying, "I don't know why you're doing this to me, I don't know what I did, why are you doing this to me, someone help me."  (Tr. 2:28).  Burke testified that when Porter broke the window, he was yelling "[g]et the fuck out of the car, get the fuck out, get the fuck out," and that "at the end" he yelled, "I'm a Massachusetts State Police [sic], get out." (Tr. 2:34).  Burke testified that he thought "he was going to do some bodily harm to her, absolutely," and that "it was pretty violent."  (Tr. 2:29-30).   Burke called 911.  (Tr. 2:28).

### b.     Maureen Flanagan

Maureen Flanagan was the driver of the car in front of Shea's.  (*See* Tr. 2:44).  Flanagan testified that after Porter smashed the window, she could hear Shea yelling "help me, help me." (Tr. 2:45).  Shea sounded "extremely upset, distraught, frightened."   (Tr. 2:45).  Shea asked her to call the police.  (Tr. 2:45).  Flanagan said that she was "frightened of the whole event," that it seemed "violent," "dangerous," and "very scary."  (Tr. 2:46).  She also testified that Shea was "cowering in her car, visibly upset," and that she was "afraid [Shea] was going to be harmed."

(Tr. 2:47).  She did not believe that Porter was a police officer.  (Tr. 2:47-48).  Flanagan thought

it was a "domestic violence situation" and that Shea was in danger.  (Tr. 2:48).  Flanagan also

called 911.  (Tr. 2:45).

### c.  Eugene Irwin

Eugene Irwin was at a nearby house.  (Tr. 4:53).  He testified that he saw Porter drive the

unmarked vehicle at a high rate of speed, with tires screeching.  (Tr. 4:56).  The car then stopped

behind Shea's car.  (Tr. 4:57).  He described the incident as follows:

> The person in the second car, a male, got out of the car, aggressively approached the
> first car.  When he got to first car, he was tugging at the door handle.  He was
> punching at the window.  He was screaming, "Get out of the F'ing car," but the real
> words, and "Get out of the F'ing car, you bitch."  Punching the glass aggressively,
> grabbing at the door handle . . . after punching the glass on the driver's side window
> and screaming I'd say at the top of his lungs about as loud as anyone could scream
> these obscenities and yelling, "You fucking bitch, get out of the car," and jerking on
> the door handle, I then noticed him go back to his car.  And his hand was bloody, and
> I thought he was going to get a towel or something.  . . .
>
> [H]e went back to his car, and he grabbed what I thought was a mag flashlight and
> went back up to the first car again, struck it on the window, I believe twice before the
> window broke.  . . .
>
> He then reached through the window, opened the door, took the woman in the first
> car, ripped her out of the car, threw her to the ground and cuffed her.  . . .
>
> The driver of the first car, the woman, was crying.  She was hysterical.  As the door
> was opening, she was screaming, "Help. Call the police. Someone call the police.
> Help. Who are you?"  But within an instant, she was on the ground and cuffed.

(Tr. 4:57-59).  Irwin testified that he thought it was a "domestic incident" and that he had no idea

that Porter was a police officer.  (Tr. 4:57-58).  He also testified that Shea got herself up from the

ground and walked over to a stone wall, where she sat shaking and crying.  (Tr. 4:60).  When the

Milton Police arrived, Irwin heard Porter say, "she's fucking mine."  (Tr. 4:61).

### d.    Karen Sykes

Karen Sykes lived in a house near Clifton Road.  (Tr. 4:81).  She heard noises, including breaking glass, and went outside to investigate.  (Tr. 4:82).  She saw Porter and Shea engaged in a "struggle."  (Tr. 4:82-83).  Porter was holding her hands or wrists and yelling; Shea was crying and trying to "remove herself to get away from him."  (Tr. 4:82-83, 87).  Porter looked "angry" and Shea looked "scared."  (Tr. 4:88).  When Shea saw Sykes, she said, "call the police."  (Tr. 4:83).  Sykes thought it was a "domestic . . . situation"; she did not realize Porter was a police officer.  (Tr. 4:83-84, 88).  Sykes went back in her home and called the Milton Police.  (Tr. 4:84).

### 3.    Porter's Version of the Clifton Road Events

Porter gave the following testimony as to the episode on Clifton Road.

Porter testified that he followed Shea's car, intending to arrest her for the crime of assault with a deadly weapon.  (Tr. 4:17).[17]  He activated his lights and siren in his unmarked car.  (Tr. 3:101).

Porter caught up with Shea's car on Clifton Road.  (Tr. 3:102).  He got out of his car and approached Shea's car at the driver's side window.  (Tr. 4:17).  He was still wearing street clothes.  (Tr. 4:20).  According to Porter, he told Shea in "an authoritative voice" that he was a state police officer and directed her to roll down her window.  (Tr. 2:168).  He testified that he pointed at his badge and gun, both of which were still on his waistband.  (Tr. 4:17).  Again, he did not show any photographic identification.  (Tr. 3:120).

Shea did not obey his direction to roll down the window.  (Tr. 4:18).  Instead, according to Porter, she sat crying in the car, looking straight ahead.  (Tr. 2:170-71; 3:118-19; 4:19-20).  Porter

---

[17] The parties appear to agree that assault with a deadly weapon is an offense for which a person may be arrested, and that speeding is not.

testified that he did not recall whether she said anything.  (Tr. 2:171).  He told her that if she did not open the window, he would break it.  (Tr. 4:18).

When Shea failed to move, Porter retrieved a large flashlight from his car.  (Tr. 2:168; 4:19).  He then smashed the driver's side window with the flashlight. (Tr. 2:169-71; 4:19, 21).

Porter reached through the shattered window and unlocked the car.  (Tr. 4:22).  He put the car in park.  (Tr. 4:22).  He then grabbed Shea by the wrists and began to pull her out of the car. (Tr. 4:22).

At some point, Porter cut his hand, and began to bleed.  (Tr. 4:21).  According to Porter, he cut his hand on the glass after the window broke.  (Tr. 2:173; 4:21).

He succeeded in getting Shea out of the car.  (Tr. 4:23).  He handcuffed her and seated her on an adjacent stone wall.  (Tr. 4:24).   At that point, the Milton Police arrived.  (Tr. 4:24).

Porter testified that he did not "recall" whether he used any profanity during the episode, and that it was his "practice not to do that."  (Tr. 3:140).  He also testified that he did not "recall" whether Shea was begging bystanders for help, or to call the police, or whether she said anything at all.  (Tr. 4:19, 30-31).  He testified that he did not "hear" Shea begging the Milton police not to let him take her away.  (Tr. 3:145-47).[18]  He denied that he touched her "in any inappropriate way."  (Tr. 4:23).

### C.    Subsequent Events

Shea was charged with assault with a dangerous weapon, resisting arrest, speeding, reckless operation of a motor vehicle, failure to identify herself, and failure to stop for police. (Tr. 5:31).  She was released on bail, set by the bail commissioner, later that night.  (Tr. 5:24).  A

---

[18] He also testified that he did not "recall" taking her down on the ground.  (Tr. 4:23).

criminal complaint issued shortly thereafter.  (Ex. 2).  Porter signed the application for the complaint.  (Tr. 5:39; Ex. 1).

The criminal case against Shea was ultimately nolle prossed on October 16, 2007.  (Tr. 4:27; 5:42; Ex. 20).  In the nolle prosequi filing, the District Attorney's office stated that "a thorough investigation by local law enforcement brought to light evidence, through percipient witness statements, that would contradict the original assertions of the arresting officer."  (Ex. 20).

### D.    State Police Policies

Martha Powers is a captain in the Massachusetts State Police.  (Tr. 3:19).  She testified that she helped develop state police policies and procedures on a variety of topics.  (Tr. 3:24-27).

The state police policy for operating vehicles distinguishes between marked cruisers and unmarked (or semi-marked) cruisers.  (Tr. 3:31).  It provides in part as follows:

> Officers operating unmarked/semi-marked cruisers should be aware that motorists might not recognize them as police officers and may refuse to be or reluctant to stop.

(Tr. 3:31).   The policy goes on to note that troopers in unmarked cars, where the motorist does not recognize them as the police, should

> advise the trooper or GSQ communications section of the situation.   In many instances, people will use their cellular phone to call *77 or SP or 9-1-1 to ascertain the officer's authenticity.

(Tr. 3:33-34).

Ms. Powers also testified that according to state police policy, troopers conducting traffic stops of suspected felons should, among other things, "make an effort to conduct a stop with backup"; "ensure the portable radio is in the on position"; "inform the [police] operator the reason for the stop"; and "[a]void unnecessary conversation that may lead to verbal confrontations."  (Tr.

3:37-40; Ex. 17).

Ms. Powers also testified that state police policy was that "officers shall use or allow to be used only that force which is reasonable." (Tr. 3:43; Ex. 17). The policy states that some of the factors to consider for determining the objective reasonableness of the force were "[w]hether the suspect poses an immediate threat," "[the] [s]everity of the crime," and whether the subject is "[r]esisting or evading" arrest. (Tr. 3:44; Ex. 17).

### E. Expert Testimony

Richard Mears testified for plaintiff as an expert on police practices. Among other things, Mears testified that (1) Porter did not have probable cause to arrest Shea for the episode on Centre Lane (Tr. 4:107, 115-16); (2) Porter did not display proper police identification (Tr. 4:108-109); (3) Porter should have called in a marked cruiser if he was engaged in pursuit of Shea (Tr. 4:111-12); and (4) Porter used excessive force under the circumstances. (Tr. 4:114).

Shawn Barbale testified for defendant as an expert. He did not provide an opinion as to whether there was probable cause for an arrest.[19] He testified that Porter used reasonable force in effecting the arrest of Shea. (Tr. 6:59).[20]

### E. Procedural History

Shea filed a complaint in this Court on December 29, 2008, against multiple defendants. Among other things, the complaint asserted a claim under 42 U.S.C. § 1983, alleging that Porter violated Shea's constitutional rights to be secure against an unreasonable seizure and excessive

---

[19] Defense counsel sought to elicit such an opinion from Barbale, but the Court did not permit him to do so, as he did not provide that opinion in his expert report. (Tr. 6:58).

[20] Barbale's testimony was based in part on the assumption that Porter had asked Shea for her driver's license, as to which there was no evidence. (Tr. 6:59).

force.  The complaint also asserted, among other things, a state-law claim of malicious prosecution.

The case was tried to a jury over seven days between April 29 and May 7, 2013.  At the close of defendant's argument, plaintiff moved for judgment in her favor as a matter of law under Rule 50.  Three claims were submitted to the jury:  a claim under § 1983 for wrongful arrest, a claim under § 1983 for excessive force, and a state-law claim for malicious prosecution.  The jury found in favor of Shea on the malicious prosecution claim and awarded her damages of $60,000.  It found for Porter on the claims of wrongful arrest and excessive force.

On June 20, 2013, plaintiff moved for judgment in her favor as a matter of law under Rule 50 and for a new trial under Rule 59.  Plaintiff sought additional time in which to file a supporting memorandum due to a change in counsel.  That memorandum was eventually filed on September 30, 2013, and defendant filed an opposition on November 1, 2013.

The Court held a hearing on December 4, 2013, at which, among other things, it denied the motion for a new trial.  The Court denied the motion from the bench, without issuing a written opinion.

On January 2, 2014, plaintiff moved for reconsideration of that denial.  In substance, plaintiff contended that the Court misapprehended its authority under Rule 59 and the Seventh Amendment, in that it effectively applied the standard for a judgment as a matter of law rather than the more lenient standard for a new trial.

## II.    <u>Standard of Review</u>

The Court has "substantial discretion and broad authority" to grant a motion for reconsideration pursuant to Fed. R. Civ. P. 59(e). *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 81-82 (1st Cir. 2008). A motion for reconsideration will be granted upon a showing of (1) a "manifest error of law," (2) new evidence, or (3) a misunderstanding or other error "not of reasoning but apprehension." *Id.* The granting of a motion for reconsideration is an "extraordinary remedy" that should be used "sparingly." *Palmer v. Champion Mortgage*, 465 F.3d 24, 30 (1st Cir. 2006) (quotation and citation omitted). A Rule 59(e) motion cannot be used to "advance a new argument that could (and should) have been presented prior to the district court's original ruling." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 11 (1st Cir. 2003). Nor is a Rule 59(e) motion an appropriate means to "repeat old arguments previously considered and rejected." *Nat'l Metal Finishing Co., Inc. v. Barclays American/Commercial, Inc.*, 899 F.2d 119, 123 (1st Cir. 1990).

Motions for a new trial are governed by Fed. R. Civ. P. 59(a)(1).[21] Rule 59(a) requires a new trial "if the verdict is against the law, against the weight of the credible evidence, or tantamount to a miscarriage of justice." *Crowe v. Marchand*, 506 F.3d 13, 19 (1st Cir. 2007); *Burke v. McDonald*, 572 F.3d 51, 57 (1st Cir. 2009). When deciding a motion for a new trial, a court may independently weigh the evidence. *Jennings v. Jones*, 587 F.3d 430, 436 (1st Cir. 2009). Although the court is not required to draw all inferences in favor of the verdict, the court

---

[21] Rule 59(a)(1) provides as follows:

The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:

(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . .

"cannot displace a jury's verdict merely because [the court] disagrees with it or because a contrary verdict may have been equally . . . supportable." *Id.* (alterations in original) (quoting *Ahern v. Scholz*, 85 F.3d 774, 780 (1st Cir. 1996)) (internal quotation marks omitted). However, the court "may order a new trial 'even where the verdict is supported by substantial evidence.'" *Id.* at 439 (quoting *Lama v. Borras*, 16 F.3d 473, 477 (1st Cir. 1994)). In fact, the court has a "duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." *Id.* at 436 (quoting *Kearns v. Keystone Shipping Co.*, 863 F.2d 177, 181 (1st Cir. 1988)).

## III.  Analysis

As noted, the Court denied plaintiff's motion for a new trial in a ruling from the bench on December 4, 2013. Plaintiff then moved for reconsideration of that order, contending in substance that the Court misapprehended its authority under Rule 59 to order a new trial, and in effect applied the more restrictive standard governing judgments as a matter of law.

When the Court first considered the question of a new trial, it stated the following, among other things:

> I don't get to overturn jury verdicts simply because I disagree with them. My understanding is [that] the outcome has to be against the clear weight of evidence to the point where it's unreasonable, so unreasonable that really no reasonable juror could have reached such a result, in any event, the verdict has to result in a miscarriage of justice.

(Tr. Dec. 4, 2013 Hrg. at 12).

The Court has reconsidered its earlier ruling, at considerable length, and after a thorough review of the record and the relevant case law. For the reasons stated below, it has concluded that its earlier formulation of the standard was not correct, and imposes an unnecessary high burden

on the party seeking a new trial.  The motion for reconsideration will therefore be granted.

The question then becomes whether a new trial should be granted.  The starting point for the analysis is an overview of the relevant legal standards governing plaintiff's claims.

## A.    The Section 1983 Claim

Plaintiff has asserted two claims under 28 U.S.C. § 1983 for violation of the Fourth Amendment, one for wrongful arrest and one for excessive force.

### 1.    Wrongful Arrest

A warrantless arrest by a police officer is reasonable under the Fourth Amendment where there is probable cause to believe that the arrestee had committed or was committing a crime. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *United States v. Watson*, 423 U.S. 411, 424 (1976).

Probable cause must be determined from the perspective of an objectively reasonable and prudent police officer facing the same circumstances.  *Devenpeck*, 543 U.S. at 152.  A police officer's actual, or subjective, state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.  *Id.*  Thus, "[t]he inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances." *United States v. Jones*, 432 F.3d 34, 41 (1st Cir. 2005) (citation omitted).

### 2.    Excessive Force

In making an arrest, a police officer is permitted to use such force as is reasonable under the circumstances.  *Graham v. Connor*, 490 U.S. 386, 395-97 (1989).  In other words, a police officer engaged in an otherwise-lawful arrest is permitted to use the amount of force that a reasonable officer would have used under similar circumstances.  *Id.* at 396-97.

Whether force was excessive depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396

Whether the defendant's use of force was excessive is judged from the perspective of an objectively reasonable and prudent police officer facing the same circumstances that the defendant officer faced at the time. *Graham*, 490 U.S. at 397 (claims of excessive force are analyzed under an "objective reasonableness" standard, whereby the court examines "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation"). A police officer's actual, or subjective, intent or motivation does not govern whether the force was excessive. *Id.*

### B. Elements of the State Offenses

Plaintiff was arrested and charged with six separate crimes: assault with a dangerous weapon, reckless operation of a motor vehicle, resisting arrest, refusal to identify herself to a police officer, failure to stop for a police officer, and speeding. All but speeding are "arrestable" offenses under Massachusetts law. *See Commonwealth v. Chown*, 459 Mass. 756, 759 n.8 (Mass. 2011)

#### 1. Assault with a Dangerous Weapon

The first crime with which the plaintiff was charged is assault with a dangerous weapon. *See* Mass. Gen. Laws ch. 265, § 15B(b).[22] Under Massachusetts law, there are two ways that an

---

[22] The statutory text is as follows: "Whoever, by means of a dangerous weapon, commits an assault upon another shall be punished by imprisonment in the state prison for not more than five years or by a fine of not more than one thousand dollars or imprisonment in jail for not more than two and one-half years." Mass. Gen. Laws ch. 265, § 15B(b).

individual can commit this crime: an "attempted battery" (for example, intentionally swinging at a person with a bat and missing), or a "threatened battery" (for example, waving a bat at a person in an overt and objectively menacing way). *Commonwealth v. Porro*, 458 Mass. 526, 530 (2010) (citing *Commonwealth v. Richards*, 363 Mass. 299, 303 (1973)).

Under the "attempted battery" theory, the prosecution must prove that (1) the defendant "intended to commit a battery," (2) "took some overt step toward accomplishing that intended battery," and (3) "came reasonably close to doing so." *Porro*, 458 Mass. at 530 (quoting *Commonwealth v. Melton*, 436 Mass. 291, 295 (2002)). Under this theory, it is not necessary that the victim be aware of the attempted battery. *Porro*, 458 Mass. at 530.

Under the "threatened battery" theory, the prosecution must prove that (1) "the defendant engaged in conduct that a reasonable person would recognize to be threatening," (2) "the defendant intended to place the victim in fear of an imminent battery," and (3) "the victim perceived the threat." *Porro*, 458 Mass. at 530-31 (citing *Commonwealth v. Chambers*, 57 Mass. App. Ct. 47, 49, 51 (2003)); *Commonwealth v. Musgrave*, 38 Mass. App. Ct. 519, 523–524 (1995), opinion adopted in full, 421 Mass. 610 (1996). "The victim need not actually be in fear, but must apprehend the risk of an imminent battery." *Porro*, 458 Mass. at 531.

Under either theory, the assault must be made with a "dangerous weapon." An ordinarily innocuous item, such as an automobile, may be considered a dangerous weapon when it is used in an improper or dangerous way that endangers another's safety. *See Porro*, 458 Mass. at 528 (swerving automobile); *Commonwealth v. Appleby*, 380 Mass. 296, 304 (1980) (citing *Commonwealth v. LeBlanc*, 3 Mass. App. Ct. 780, 780 (1975) (automobile door used to strike police officer)).

## 2. <u>Reckless Operation of a Motor Vehicle</u>

The second crime with which the plaintiff was charged is reckless operation of a motor vehicle. Mass. Gen. Laws ch. 90, § 24(2)(a).[23] Under Massachusetts law, an individual commits the crime of reckless operation of a motor vehicle if he or she (1) operates a motor vehicle, "(2) upon a public way, (3) recklessly or negligently so that the lives and safety of the public might be endangered." *Commonwealth v. Duffy*, 62 Mass. App. Ct. 921, 921 (2004); *Commonwealth v. Daley*, 66 Mass. App. Ct. 254, 255 (2006).

## 3. <u>Resisting Arrest</u>

The third crime with which the plaintiff was charged is resisting arrest. *See* Mass. Gen. Laws ch. 268, § 32B.[24] Under Massachusetts law, an individual commits the crime of resisting

---

[23] The statutory text is as follows:

> Whoever upon any way or in any place to which the public has a right of access . . . operates a motor vehicle recklessly, or operates such a vehicle negligently so that the lives or safety of the public might be endangered, . . . [shall be guilty of an offense].

Mass. Gen. Laws ch. 90, § 24(2)(a).

[24] The statutory text is as follows:

> (a) A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer, acting under color of his official authority, from effecting an arrest of the actor or another, by:

> (1) using or threatening to use physical force or violence against the police officer or another; or

> (2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another.

> (b) It shall not be a defense to a prosecution under this section that the police officer was attempting to make an arrest which was unlawful, if he was acting under color of his official authority, and in attempting to make the arrest he was not resorting to unreasonable or excessive force giving rise to the right of self-defense. A police officer acts under the color of his official authority when, in the regular course of assigned duties, he is called upon to make, and does make, a judgment in good faith based upon surrounding facts and circumstances that an arrest should be made by him.

arrest if (1) he or she knowingly prevents or attempts to prevent a police officer from effecting an arrest, (2) that police officer has the authority to effect the arrest, and (3) he or she uses or threatens to use physical force or violence against the police officer or another, or otherwise creates a substantial risk of bodily injury to the police officer. *Id.*; *see Commonwealth v. Joyce*, 84 Mass. App. Ct. 574, 581 (2013).

To prove this crime, the Commonwealth must prove, among other things, that the individual knew that the person effecting the arrest was a police officer, and that the defendant understood he was being arrested. *Commonwealth v. Grant*, 71 Mass. App. Ct. 205, 209 (2008). "[T]he crime is committed, if at all, at the time of the 'effecting' of an arrest." *Commonwealth v. Grandison*, 433 Mass. 135, 145 (2001). An arrest occurs when there is (1) "an actual or constructive seizure or detention of the person," (2) "performed with the intent to effect an arrest," and (3) is "so understood by the person detained." *Grant*, 71 Mass. App. Ct. at 208 (quoting *Grandison*, 433 Mass. at 145). "The standard for determining whether a defendant understood that he was being arrested is objective—whether a reasonable person in the defendant's circumstances would have so understood." *Id.* "Fleeing from, or even resisting, a stop or patfrisk does not constitute the crime of resisting arrest." *Id.* The officer must, through his words or actions, objectively communicate an intent to effect an arrest. *Id.*

### 4. Refusal to Identify

The fourth crime with which the plaintiff was charged is refusing to identity herself to a

---

(c) The term "police officer" as used in this section shall mean a police officer in uniform or, if out of uniform, one who has identified himself by exhibiting his credentials as such police officer while attempting such arrest.

Mass. Gen. Laws ch. 268, § 32B.

police officer while operating a motor vehicle.  Mass. Gen. Laws ch. 90, § 25.[25]  Under

Massachusetts law, an individual commits this crime if (1) while operating a motor vehicle, (2) he

or she refuses to give his or her name and address upon request, (3) when the request is made by a

police officer who is in uniform or has his badge conspicuously displayed on the outside of his

clothing, and (4) the individual realizes that the police officer has made such a request, and

intentionally disobeys that request.  *Id.*; *see Commonwealth v. Gray*, 423 Mass. 293, 295 (1996).

Again, to prove this crime, the Commonwealth must prove, among other things, that the

individual knew that the person making the request was a police officer.  *Gray*, 423 Mass. at 295.

### 5.  Failure to Stop for Police

The fifth crime with which the plaintiff was charged is failure to stop for police.  Mass.

Gen. Laws ch. 90, § 25.  Under Massachusetts law, an individual commits this crime if, (1) while

operating a motor vehicle, (2) he or she refuses or neglects to stop when signaled to do so by a

police officer, (3) when the police officer is in uniform or has his badge conspicuously displayed

on the outside of his clothing, and (4) the individual realizes that the police officer has made such

a request, and intentionally disobeys that request.  *Gray*, 423 Mass. at 293.

Again, to prove this crime, the Commonwealth must prove, among other things, that the

---

[25] The statutory text is as follows:

> Any person who, while operating or in charge of a motor vehicle, shall refuse, when requested by a police officer, to give his name and address or the name and address of the owner of such motor vehicle, or who shall give a false name or address, or who shall refuse or neglect to stop when signalled to stop by any police officer who is in uniform or who displays his badge conspicuously on the outside of his outer coat or garment, or who refuses, on demand of such officer, to produce his license to operate such vehicle or his certificate of registration, or to permit such officer to take the license or certificate in hand for the purpose of examination, . . . shall be punished by a fine of one hundred dollars.

Mass. Gen. Laws ch. 90, § 25.

individual knew that the person making the request was a police officer.  *Gray*, 423 Mass. at 293; *Commonwealth v. Materia*, 350 Mass. 785, 785 (1966).

### 6. Speeding

Finally, plaintiff was charged with speeding.  *See* Mass. Gen. Laws ch. 90, § 17.  Under Massachusetts law, an individual commits the offense of speeding if he or she operates a motor vehicle "at a rate of speed greater than is reasonable and proper."  *Id.*  If a lawful speed limit has been established, operation of a motor vehicle at a rate of speed that is greater than the established speed limit is evidence of operation at a speed that is greater than is reasonable and proper.  *Id.*

Ordinarily, "[w]hen the police are justified in stopping an automobile for a routine traffic violation, they may, for their safety and the safety of the public, order the driver or the passengers to leave the automobile, but only if they have a reasonable belief that their safety, or the safety of others, is in danger." *Commonwealth v. Damon*, 82 Mass. App. Ct. 164, 169-70 (2012) (quoting *Commonwealth v. Torres*, 433 Mass. 669, 673 (2001)).

Under Massachusetts law, a person may not be arrested solely for the offense of speeding. *See Commonwealth v. Chown*, 459 Mass. 756, 759 n.8 (Mass. 2011) ("There is no dispute that these two infractions [failing to have registration in possession and speeding] do not amount to arrestable offenses.").

### C. Wrongful Arrest

The first question is whether Porter had probable cause to arrest Shea.  As noted, she could not have been arrested merely for speeding.  The question therefore depends on whether there was probable cause to believe that she had committed at least one of five crimes:  (1) assault with a deadly weapon, (2) reckless operation of a motor vehicle, (3) failure to stop for police, (4)

refusal to identify herself to a police officer, and (5) resisting arrest.

The evidence of an assault with a deadly weapon, to the extent it exists, was based entirely on Shea's operation of her automobile. There was no reason to believe that Shea tried to hit Gorfinkle, and missed; thus, if any assault occurred, it was a threatened battery, not an attempted battery. As noted, that crime requires proof (1) that Shea engaged in conduct that a reasonable person would recognize was threatening, (2) that Shea intended to place the victim in fear of an imminent battery, and (3) that Gorfinkle perceived the threat. *Porro*, 458 Mass. at 530-31.

The evidence that Shea engaged in threatening conduct was thin at best, and the evidence that she actually intended to threaten harm to Gorfinkle was thinner yet. Shea was a middle-aged woman, driving down a suburban street in broad daylight. She may or may not have been speeding. Gorfinkle stepped out into the street, waving her arms. The gesture was ambiguous; it could have easily been interpreted as a request to stop, a request to slow down, or a request for help. Shea thought it was the latter, and stopped. Whatever speed she may have been traveling, she stopped quickly without skidding, screeching her brakes or tires, or causing the front end of her automobile to dip. It is undisputed that she turned the car to the side and brought it to a stop near Gorfinkle. There was no evidence that Gorfinkle cried out in fear or alarm. There is no evidence that she jumped back or even flinched.

There was no real evidence that Shea had a motive to harm or threaten Gorfinkle. There was no evidence—and no reason to believe—that Shea and Gorfinkle knew each other, or had any animosity toward one another. There was no evidence that either one used any angry words or gestures immediately before or during the incident. And the entire event took place in a matter of seconds; if Shea intended to threaten Gorfinkle, she would have had to formulate that intent in

the split-second interlude between seeing Gorfinkle wave her hands and bringing her vehicle to a stop.

A reasonable police officer certainly would have had cause to perform a traffic stop: to ask Shea for her license and registration, to run her license plate number through the computer, and to ascertain whether there was any issue that required further investigation (for example, evidence of intoxication). And a reasonable police officer presumably could have issued her a citation for speeding. But it is difficult to believe that a reasonable police officer would have had probable cause to arrest Shea at that point for felony assault.

The evidence that Shea had committed the crime of reckless operation of a motor vehicle was likewise slight. If she in fact was speeding, she could not have been driving very much over the limit. She was not intoxicated. She had not wandered in and out of her lane, or off the street entirely. In short, there was little reason to believe that Shea had operated her motor vehicle in a manner that was likely to result in the death or serious injury to another person, or that she was indifferent to that possibility. *Compare Duffy*, 62 Mass. App. Ct. at 922 (defendant's speed was twice the legal limit); *Commonwealth v. Jones*, 382 Mass. 387, 387-88 (1981) (defendant was intoxicated and driving wrong way down highway).

In any event, Porter did not immediately place her under arrest; instead, he testified that he decided to investigate. It is undisputed that he was in plain clothes, not a police uniform. He was on foot, not in a marked police cruiser. His badge was on his belt, and his firearm was in a holster on his hip. It is undisputed that he did not display any photographic identification.

Porter walked up to the car window, knocked on it, and demanded in a loud voice that Shea roll down the window. (According to Shea, he told her she would spend the night in jail if

she did not.)  He did not ask for her license or registration.  Shea did not respond to his demand, but instead made a call on her cell phone to the police.  (According to Shea, Porter heard her on the phone asking to speak with the police.)

At that point, no reasonable police officer would have believed that Shea had committed the crime of failure to stop for the police; she had already stopped the car before Porter became involved.  And no reasonable police officer would have believed that she had committed the crime of failure to identify herself to a police officer; he never asked her to do so.

Furthermore, Shea could not have committed either crime unless she (1) realized that a police officer had made a lawful command or request and (2) intentionally disobeyed it.  *See Gray*, 423 Mass. at 295.  Porter was not dressed like a police officer.  Any person in Shea's position would have been at least somewhat surprised to find a man on foot suddenly appear at her window, wearing plain clothes, claiming to be a police officer, with no marked cruiser anywhere in sight.  And any person in Shea's position would have expected a police officer to ask for her driver's license and registration, which Porter never did.  A woman who was by herself would of course have greater cause for suspicion, or even fear, than most other drivers.  Although it is true that Porter's badge was displayed on his belt, and he had a gun on his hip, a reasonable police officer would likely be aware that under the circumstances a motorist might not recognize him as such.  Indeed, Massachusetts State Police policy expressly addresses the likelihood of such a scenario, and directs that plainclothes officers should communicate with the dispatcher if the motorist does not trust or recognize the person as a police officer.  (Ex. 17).

Did the new information obtained by Porter as a result of his interaction with Shea on Centre Lane change the mix of evidence, such that a reasonable officer would now have probable

cause to believe that an assault had occurred?  It might have given a reasonable officer cause to investigate further, at least to be assured that Shea was not in distress.  But Porter saw no evidence of intoxication or impairment.  And that interaction did not provide additional evidence that Shea harbored any animosity or malice toward Gorfinkle, such that a reasonable officer would conclude that she intended to injure her or place her in fear.

In any event, if Porter thought that Shea was a dangerous felon—who had committed a criminal assault in his presence, threatening the life or safety of an innocent mother—he did not act that way.  After only 45 seconds, he left Shea alone on the street and went into his house.  He did not advise her that she was under arrest.  He did not display his weapon.  He did not command her to stay where she was.  He did not explain where he was going.  Indeed, he testified at trial that Shea was free to leave.  It seems clear that Porter, at that point, subjectively did not believe that Shea had committed a violent crime.  And while the standard is an objective one, Porter's actions surely underscore the fact that there was little, if any, objective evidence that she had committed an assault.

At that point, Shea drove away.  Gorfinkle's husband testified that she did so "slowly"; Porter said she "sped away."  Regardless, she was not fleeing the scene, or attempting to evade arrest.

To be sure, it was not objectively unreasonable for Porter to follow her, in order to complete the traffic stop, using a police vehicle that was equipped with a radio and a computer.  Porter did not, however, radio for a marked cruiser, or for any kind of backup.  He did not report to the dispatcher where he was and what he was doing.  He did not run her license plate through the computer.  Again, Porter's actions are entirely inconsistent with the notion that he believed

31

that Shea was a dangerous felon fleeing the scene of the crime.

When he came up behind Shea's car on Clifton Road, she was already stopped. When he came to her window, he again failed to ask for her driver's license or registration. He again failed to show her his photographic identification, despite that fact that it was obvious by that point that Shea did not believe he was a police officer. He made no real effort to convince her he was an officer; he did not call for a marked cruiser or a uniformed officer; and he did nothing to try to defuse the situation or calm Shea down.

In short, from the moment he left Centre Lane, Porter did virtually nothing that a trained and experienced professional law enforcement officer would have done. Instead, he had become enraged. He screamed profanity at Shea, repeatedly calling her a "fucking bitch." He pounded on the window until his hand was bloody. He retrieved a flashlight from his car and smashed the window, shattering fragments of glass all over Shea. He then wrenched her, terrified and screaming, out of the car. He succeeded in handcuffing her just before the Milton police arrived. He told the police that she was "fucking mine"—in other words, that they should not take custody of her or otherwise interfere with his arrest.

Porter's testimony as to the events on Clifton Road was very much sanitized, and his testimony and demeanor at trial were obviously intended to convey the impression that he had been acting reasonably and professionally in all respects. But the overwhelming weight of the evidence was to the contrary. Even apart from Shea's own testimony, four separate witnesses testified that Porter was screaming, violent, and out of control. Several thought Shea was in serious danger of bodily harm. None of the witnesses thought that Porter was a police officer. Several thought it was a domestic violence situation. And all four witnesses, and Shea herself,

testified that Shea was begging bystanders to call the police.

No reasonable officer would have concluded that Shea had committed the crime of failing to identify herself; Porter neglected at any point to ask her for identification. Similarly, no reasonable police officer would have concluded that she committed the crime of failing to stop for the police; her automobile was stopped in both instances before Porter even approached her. And her failure to remain at Centre Lane cannot have constituted the crime of failing to stop; Porter left the scene and did not tell her to stay. Indeed, he testified at the trial that she was free to leave.

As for the crime of resisting arrest, it is true that Shea did not simply quietly cooperate with Porter's efforts to remove her from the car. The evidence, however, that she used physical force against Porter was slight at best, and whatever mild force or resistance she may have employed was entirely defensive. There was no evidence that she was violent, made threats, or created a substantial risk of bodily injury to Porter. More importantly, the crime requires that the perpetrator know that the person arresting her is in fact a police officer. The overwhelming weight of the evidence was that Shea did not believe he was an officer, and in fact she was begging bystanders to call the police.

As for the crimes of assault with a deadly weapon and reckless operation of a motor vehicle, Porter's probable cause consisted entirely of his observations on Centre Lane. Nothing that he learned on Clifton Road added any weight to the probable-cause calculation.

To be sure, Shea's actions were not free from blame. She may well have been speeding on Centre Lane. The manner in which she brought her car to a stop may have startled Gorfinkle. Her confusion and fear during her initial interaction with Porter made matters more difficult, and she made matters worse yet by refusing to communicate with Porter at all.

Furthermore, the actions of Porter cannot be judged entirely by hindsight. As is often said, police officers necessarily make quick decisions in the field; it is inevitable that even good officers will make mistakes and have lapses in judgment. Not every police mistake rises to the level of a constitutional violation.

Nonetheless, it is difficult to believe that a reasonable officer would have concluded (1) that there was probable cause to believe that Shea had committed a crime, and (2) that an arrest was an appropriate response. It is true that the jury verdict as to wrongful arrest is legally supportable, as there was sufficient evidence to sustain it. But it the clear weight of the evidence points to an opposite conclusion: that an objectionably reasonable and prudent police officer would not have had probable cause to believe that Shea had committed an arrestable offense.

### D. <u>Excessive Force</u>

The second question is whether Porter used excessive force. It is true that the physical force he used against Shea, standing alone, did not rise to the level that is commonly associated with claims against police officers for excessive force. Porter did not punch or beat Shea; he did not strike her with a baton; and of course he did not shoot her. Nonetheless, direct physical violence is not the only measure of excessive force. Excessive force claims may be based entirely on an undue threat of force, or placing a defendant in dangerous circumstances, even in the absence of physical contact. *See, e.g., Martin v. Board of Cnty. Comm'rs of Cnty. of Pueblo*, 909 F.2d 402, 406-07 (10th Cir. 1990) (officers forcing arrestee with recently fractured neck to walk out of the hospital and ride in van to police station); *Black v. Stephens*, 662 F.2d 181, 189 (3d Cir. 1981) (finding jury verdict of excessive force supported by evidence where police officer threatened plaintiffs with a gun). Although a claim of excessive force requires proof of "at least

some injury," psychological injuries are sufficient to sustain such a claim. *Flores v. City of Palacios*, 381 F.3d 391, 397-98 (5th Cir. 2004) (quoting *Jackson v. R.E. Culbertson*, 984 F.2d 699, 700 (5th Cir. 1993)) (internal quotation marks omitted); *see also Dunn v. Denk*, 79 F.3d 401, 402 (5th Cir. 1996) (finding injury sufficient to demonstrate excessive force where plaintiff suffered substantial psychological injuries even where plaintiff's only physical injuries were bruises).

The force exerted by Porter against Shea was in part physical and direct:  he grabbed her and pulled her out of the car, brought her to the ground, and eventually handcuffed her.[26]  He also exerted force against her vehicle, which clearly communicated a threat to Shea:  he pounded on her window until his hand bled, and smashed the glass with a flashlight inches from her head. Finally, his language and demeanor were overtly threatening.

It is particularly noteworthy that Porter was screaming at Shea and calling her a "fucking bitch."  Under the circumstances, that language had no legitimate law enforcement purpose, and was plainly intended both to terrorize her and degrade her.  Indeed, there was no other possible purpose in calling her a "bitch."  If he had pointed his gun at her, the display of force would have been intended to frighten or bully her into submission.  The method he chose, in context, was no less threatening.  Even if Shea recognized him to be a police officer—and she did not—any lone, middle-aged woman in her position would have been terrified.

Sometimes, of course, it is necessary for police officers to use force, or threaten to use additional force.  But under the circumstances presented here, the degree of force and threatened force was grossly disproportionate.  The evidence of Shea's alleged criminal behavior was slight;

---

[26] According to Shea, he also touched her breasts and the area between her legs in the course of the arrest.

she was not attempting to flee; and she was not an immediate threat to the safety of Porter or anyone else.

Again, the jury verdict that Porter did not employ excessive force is legally supportable, as there is sufficient evidence to sustain it. But again the clear weight of the evidence points to an opposite conclusion: that the degree of force and threatened force used by Porter was unreasonable under the circumstances.

### E.   Conclusion

Our system entrusts jurors with the power to make factual judgments, and those judgments may not be set aside lightly, at least where the jury was properly instructed and the trial was fair. But our system also permits a judge to set aside a verdict—not to impose their own views, but to order a new trial—when the verdict is against the clear weight of the evidence.

That standard is satisfied here. The jury verdict as to the claims of wrongful arrest and excessive force were against the clear weight of the evidence, and a new trial is therefore warranted. In fairness to defendant, and in order to permit the new jury to decide the case in its entirety, the verdict in Shea's favor for malicious prosecution will be set aside as well, so that the entire case may be retried.

## IV.   Conclusion

For the reasons set forth above, the motion of plaintiff Shea for reconsideration and a new trial is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  October 31, 2014